UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NATIONAL GLASS & GATE SERVICE, INC. d/b/a NG & G FACILITY SERVICES INTERNATIONAL, INC., Plaintiff | : | |
| vs. | : | C.A. No.: 08-186/S |
| SERVICE EVERYWHERE, LLC, Defendant | : | |

**MEMORANDUM IN SUPPORT OF DEFENDANT, SERVICE EVERYWHERE, LLC'S MOTION TO DISMISS, OR, IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE**

NOW COMES Defendant, Service Everywhere, LLC ("Service"), by and through counsel, and hereby submits the within memorandum in support of its accompanying motion to dismiss Plaintiff, National Glass & Gate Service, Inc., d/b/a NG&G Facility Services International, Inc.'s ("NG&G") Complaint, pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure, in connection with the above-identified action. In the alternative, Service moves this Court for an order transferring the instant action to the Federal Court(s) of the State of Delaware.

**Pertinent Facts**

Service is a Delaware limited liability company, having a principal place of business located in Houston, Texas. Service provides call center support, lock and key services, and

maintenance and repair services to various national clients, who own office buildings, stores and other commercial facilities. Like Service, NG&G also provides the very same types of services to a similar clientele.

In or about 2001, Service, then a "start-up" company, joint ventured with NG&G to provide services to a number of Service's clients, included in which were certain of the largest of Service's clients, *to wit*, Washington Mutual Bank, F.A. ("WaMu") and Bank of America ("BOA"), respectively. On or about January 1, 2002, Service and NG&G entered into a certain Services Agreement wherein NG&G agreed, in conjunction with Service, to furnish necessary labor, equipment, services, supplies and other incidental services necessary to perform Call Center Support and Vendor Management Support for lock and key services for the benefit of WaMu (the "WaMu Services Agreement"). *A true and accurate copy of the WaMu Services Agreement is appended hereto as Exhibit 1.*

In particular, Paragraph 24 of the WaMu Services Agreement provides, in pertinent part:

> Attorney Fees/Venue. Any suit or action to interpret or enforce this agreement or with respect to this agreement ***must*** be filed in Delaware, Md. [*sic*], if jurisdiction exists, . . . (Emphasis supplied.)

Thereafter, on or about July 1, 2004, Service and NG&G entered into another contract wherein NG&G agreed to furnish, in conjunction with Service, the necessary labor, equipment, services, supplies, and other incidental services necessary to perform call center support and vendor management support for services under Service's BOA contract (the "BOA Services Agreement"). *A true and accurage copy of the BOA Services Agreement is*

*appended hereto as Exhibit* 2. Again, Paragraph 24 of the BOA Services Agreement states, in relevant part:

> Attorney Fees/Venue. Any suit or action to interpret or enforce this agreement or with respect to this agreement ***must*** be filed in Delaware, Md. [*sic*], if jurisdiction exists, . . . (Emphasis supplied.)

In addition to the WaMu and BOA contracts, over the years Service and NG&G have entered into similar arrangements with respect to certain of Service's other clients.

In the spring of 2007, the relationship between Service and NG&G began to deteriorate. At or about that same time WaMu began questioning Service in connection with the "high cost" of certain billings it had received from NG&G relative to services rendered under the WaMu Services Agreement. Generally, vendors that work on projects invoiced Service; however, in practice all invoices were actually addressed to Service in care of NG&G for payment. NG&G would add an agreed-upon "mark-up" to vendor invoices, and send out a bill to Service's clients under Service's logo. With respect to WaMu's 2007 inquiry, when Service received the same, it pulled a random sampling of invoices from NG&G, and found that a large number of the NG&G invoices reflected the maximum allowable fee. In light of WaMu's inquiries and concerns, this indicated to Service that there was enough probable cause for an audit of NG&G's billing practices.

As a result of its efforts in this regard, Service eventually learned that:

(1) NG&G had overcharged Service for sales taxes, and that there were other possible overpayments by Service;

(2) There were instances where NG&G collected monies due Service, but neither reported or remitted the same to Service;

(3) There were instances of vendors complaining of non-payment;

(4) There were discrepancies with respect to billing and/or accounting practices;

(5) There were instances where NG&G billed clients directly (i.e., invoices addressed on NG&G letterhead rather than under Service's logo which effectively re-directed funds to NG&G;

(6) There were "sale no cost" and "cost no sale" information that materially impacted monies reconciliation and/or funds owed to NG&G that NG&G promised Service, but never provided; and

(7) There were reports that a "transaction fee" charged to vendors by NG&G may have been charged on Service work orders.

In other words, there were potential problems and/or issues regarding NG&G's conduct that were serious enough to warrant further investigation by Service. Service believes that it was these attempts to "get to the bottom" of NG&G's questionable practices that led to the events that eventually transpired in the second half of 2007.

Prompted by what it had discovered, Service requested, in or about June, 2007, that NG&G submit to an audit, as well as other certain accountability procedures. Further, Service and NG&G actually met in June to review and discuss Service's requirements in accordance with the so-called audit requirements in its contracts with its clients. As a practical matter, NG&G was very resistant to being held accountable to Service. In fact, in an attempt to thwart any further actions by Service, NG&G proposed to Service's partners that Service dismantle its office and allow NG&G to "run" all Service

operations out of their Providence, Rhode Island office so that NG&G could control all billing and accounting protocols.

Shortly thereafter, NG&G began to escalate demands for payment with Service over allegedly past due invoices; however, because certain of those billings had not yet been collected by Service the same were not yet due and owing to NG&G until such time as the same were collected. This was done despite the fact that NG&G participated in weekly collection calls with Service in which all payments and collection efforts were reported and discussed by and between Service and NG&G.

In late Summer of 2007, NG&G continued to accuse Service of non-payment of certain monies even though the same were not contractually due and owing NG&G, and, further, attempted to use that demand to threaten Service, disparage Service's reputation with its customers, and, eventually, as an excuse to terminate the WaMu and BOA Service Agreements, respectively, in February, 2008. Service repeatedly tried to defuse the "non-payment" dispute, as well as obtain NG&G's audit compliance. NG&G responded mostly by threatening to file liens against Service's clients, although it had no contractual right to do so, knowing that the same would significantly compromise Service's relationship and ongoing business with those clients.

At or about the end of 2007, while Service was endeavoring in good faith to resolve its disputes with NG&G, upon information and belief, NG&G induced one of Service's clients to terminate Service's services, and to retain NG&G directly without giving Service any notice or explanation with respect to the same. Not long thereafter, NG&G also removed Service's outstanding billings to the client from the software shared by and

between NG&G and Service. NG&G also collected the monies due Service from that client, but did not notify Service, or pay or account due Service for the funds prior to the termination of the contract.

NG&G also directly billed some of Service's clients, without notice to Service, in an apparent attempt to divert funds due Service. In addition, in the course of performing services for one of Service's larger customers, BOA, NG&G also began to replace certain vendors with an NG&G affiliate that charged higher prices without any business justification for doing so. The effect of such actions were simply to squeeze Service's profit margins, and to try to gain a competitive advantage. Finally, in or about February, 2008, NG&G abruptly locked Service out of the software leased from NG&G without prior notice. The software was needed by Service to provide services to service his clients, and as such, Service was forced to scramble to transition clients and operate under new software, at great expense, to protect itself in the continuance of business operations.

Subsequently, in late February, 2008, NG&G terminated the WaMu and BOA Services Agreements, respectively. After termination of those contracts, Service tried to resolve the still outstanding business issues with NG&G; however, the same was not resolved despite certain accommodations entered into by and between NG&G and Service in the early Spring of 2008.

Thereafter, on April 25, 2008, in a preemptive action, notwithstanding that the same was contrary to the forum selection clauses in the WaMu and BOA Services Agreements, respectively, NG&G filed the instant litigation in the Rhode Island Superior Court, Providence County. On May 15, 2008, Service filed its Notice of Removal,

pursuant to 28 U.S.C. §§ 1441 and 1446, respectively, thereby removing the instant matter from the Providence County Superior Court to this Court. Notwithstanding said removal, however, in light of the clear and unambiguous provisions of the forum selection clauses contained in Paragraph 24 of the WaMu and BOA Services Agreements, respectively, it is clear that this Court is not the proper venue for the present case.

Thus, Service prays that this Court dismiss the above-entitled action, or, alternatively, that the same be transferred to the Federal Court(s) of the State of Delaware, pursuant to the express and exclusive terms of the parties' contract.

**Argument**

It is axiomatic that contract terms must be assigned their plain and ordinary meaning. *Cohen v. GTech Corp.*, 2006 WL 3059980, *4 (R.I. Super. 2006) (citing *Rivera v. Gagnon*, 847 A.2d 280, 284 (R.I. 2004)). As such, if the contract terms are clear and unambiguous, judicial construction is at an end and the terms of a contract will be applied as written and the parties bound by them. *W.P. Assocs. v. Fossier, Inc.*, 637 A.2d 353, 356 (R.I. 1994); *Marsh v. Billington Farms, LLC.*, 2006 WL 2555911, *8 (R.I. Super. 2006). The general proposition is termed the "plain meaning" of rule of construction for contracts. *Marsh*, 2006 WL 2555911, *8. Unless a contract is ambiguous, courts must confine themselves to the "four corners" of the contract. *Pawtucket Fraternal Order of Police, Lodge No. 4 v. City of Pawtucket*, 829 A.2d 69, 70 (R.I. 2005).

In the instant matter, Paragraph 24 of the WaMu and BOA Service Agreements, respectively, is clear and unambiguous. In entering into, and executing, these contracts, the parties specifically provided for a venue of choice in which to have any disputes arising

concerning, relating to or in connection with the subject Services Agreements determined, namely, in the courts of the State of Delaware. Thus, the instant action must be dismissed, or, in the alternative, transferred to the Delaware court system(s).

"A motion to dismiss based on a forum-selection clause may be raised at any time in the proceedings before disposition on the merits." *Sylvia v. Encyclopedia Britannica, Inc.*, 239 F. 3d, 385, 388 (1st Cir. 2001). The First Circuit has routinely held that courts "must give effect to freely negotiated form selection clauses." *KKW Enterprises, Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp.*, 184 F.3d 42, 52 (1st Cir. 1999). This is especially true where "the choice of forum was made at an arm's length negotiation by experienced and sophisticated businessmen, in absence some compelling in countervailing reason it should be honored by the parties and enforced by the courts." *Id.* (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12 (1972)).

A forum selection clause is "necessarily exclusive", and "when the parties agree that they 'will submit' their dispute to a specified form, they do so to the exclusion of all other forms." *Summit Packaging Systems, Inc. v. Kenyon & Kenyon*, 273 F.2d 9, 13 (1st Cir. 2001). Moreover, the fact that a form selection clause is a "boilerplate" provision in the contract does not render it invalid because it "is not the law that one must bargain for each and every written term of the contract." *Sylvia*, 239 F.3d at 389.

The burden of proof is on the "party resisting the forum – selection clause to show that enforcement of the clause would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Royal Bed & Spring Co., Inc. v. Famossul Industria e Comercio de Moveis Ltda.* 906 F.2d 45, 49 (1st Cir. 1990) (citing *M/S Bremen*, 407

U.S. at 12). Further, a party that has agreed to be bound by a valid forum selection clause cannot assert a forum *non conveniens* as a ground for dismissing a suit brought in the chosen form. *Id.* In fact, according to the United States Supreme Court, a forum selection clause will only be invalidated where "the party seeking to escape his contract to show that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court." *Id.* (quoting *M/S Bremen*, 407 U.S. at 18). "Absent that, there is no basis for concluding that it would be unfair, unjust or unreasonable to hold that party to his bargain." *Id.*

It is beyond dispute that the parties negotiated for, and agreed-upon, the exact forum selection clause reflected in Paragraph 24 of the WaMu and BOA Services Agreements, respectively. In fact, the parties expressly agreed-upon a mandatory forum selection clause for the Delaware courts, which incidentally, is the state of organization of Service. Thus, it is also beyond dispute that jurisdiction exists in Delaware, and, further, that Delaware is the proper venue for this matter.

Even more, it is plain that the negotiation of the subject Services Agreements were the result of an arm's length business dealing by and between Service and NG&G. Presumably, the parties specifically contemplated that should any dispute arise thereunder the same would be determined in the duly selected forum or venue, Delaware. Thus, given the attendant facts and circumstances, and in the absence of any extraordinary prejudice to NG&G, which does not exist herein, this Court must enforce the parties' contracts as written.

Accordingly, in light of the prevailing case law on this issue, this Court should dismiss this litigation forthwith, and direct NG&G to "re-file" the same in Delaware as contemplated, and required, by the subject Services Agreements. Alternatively, the instant action should be transferred to the Federal Court(s) of State of Delaware in order that the parties' dispute may be adjudicated in conformity with, and pursuant to, the terms and conditions of the subject contracts.

WHEREFORE, for the foregoing reasons, Service respectfully prays that this Court enter an order dismissing NG&G's Complaint or, in the alternative, that this court enter an order transferring the instant action to the Federal Court(s) of the State of Delaware, that this Court award to Service any and all attorneys' fees and costs incurred in Service's defense of NG&G's Complaint, as well as the preparation of prosecution of the within motion, and, further, that this Court award to Service such other further relief as this Court may deem fair, just and reasonable.

Respectfully submitted,

Service Everywhere, LLC

By its Attorneys,

/s/ Christopher M. Mulhearn
Christopher M. Mulhearn (#5188)
**Ferucci Russo, P.C.**
55 Pine Street, Fourth Floor
Providence, RI 02903
Tel: (401) 455-1000
Fax: (401) 455-7778
Email: cmulhearn@frlawri.com

Dated: May 19, 2008

## Certification of Service

I hereby certify that on this 19th day of May, 2008, a true and accurate copy of the foregoing was served upon **Stacy P. Nakasian, Esq.**, Duffy, Sweeney & Scott, Ltd., One Turks Head Place, Suite 1200, Providence, Rhode Island, 02903, by e-mail.

/s/ Christopher M. Mulhearn

# EXHIBIT 1

COPY

# SERVICES AGREEMENT

This Services Agreement (the "Agreement") is effective as of January 1, 2002, between Service Everywhere, L.L.C., a Delaware company (sometimes called "Company" or "Contractor"), and National Glass & Gate Service, Inc., a Rhode Island corporation ("National").

## Background

The Company is the Contractor under the Master Independent Contractor's Agreement for Facility Management (the "Contract") between Washington Mutual Bank, F.A. (hereinafter called "Owner") and the Company, dated April 1, 2002, for Washington Mutual Bank, F.A.'s locations stipulated in the contract (the "Project"). CB Richard Ellis Corporate Facilities Management, Inc., a Delaware corporation is the ("Manager") for the Owner for certain properties owned or leased by the Owner or by affiliates of the Owner which are included in the Contract. National has agreed to furnish, in conjunction with Service Everywhere, necessary labor, equipment, services, supplies, and other incidental services necessary to perform Call Center Support and Vendor Management Support for lock and key services under the Contract. This Agreement sets forth the terms and conditions pursuant to which the Company will engage National's services.

## Agreement

The parties agree as follows:

1. *National Services*. The Company engages National to provide the services described on any mutually signed Statement of Work attached to this Agreement as Exhibit A ("Statement of Work"). For any work that is included in the Statement of Work, National agrees to be bound by the applicable provisions of the Contract and General Conditions between the Owner, and the Company, including any specifications therein (collectively called the "Contract Documents"), and amendments thereto, and any requirements of the Manager. The Company has provided to National a complete copy of all of the Contract Documents and agrees to furnish in writing to National any additional requirements of the Manager as now known or shall hereinafter be specified. National agrees to assume toward the Company all of the obligations and responsibilities that the Company by the Contract Documents assumes toward the Owner, insofar as they are applicable to the work to be performed under this Services Agreement.

2. *Warranty*. National shall warrant its work in accordance with the terms of the Contract Documents, or if no warranty is called for during the term of the Project, National shall perform all work in accordance with the Contract Documents, the instructions of the Company and Manger, and in a workmanlike manner. The work to be performed under this Agreement shall

be commenced immediately upon notice from the Company. National will provide the required manpower, materials, associated submittals and equipment to comply with the Contract Documents and to assure that the Call Center and Vendor Management Support Center is being properly run throughout the term of the Contract. National shall complete the work undertaken pursuant to the Statement of Work in a prompt and workmanlike manner and shall not, by delay or otherwise, interfere with or hinder the work of the Company or subcontractors retained by the Company. National shall be responsible for proper coordination of its services with that of the Company and such subcontractors and shall be available, or have representatives available, upon reasonable prior notice, at project meetings and at other times as necessary to assist with this coordination.

3. *Compensation*. Company will compensate National pursuant to the terms of Exhibit B.

4. *Term*. The term of this Agreement shall begin on the above date, and, subject to earlier termination as provided below, terminate concurrently with the Contract.

5. *Termination.*

a. A party shall have the right to terminate this Agreement at any time by notice in writing to the other party upon any of the following events:

i. If the other party commits a material breach of any of the terms of this Agreement and does not, within thirty (30) days of receipt of notice of the breach (if the same be capable of remedy), remedy such breach or in the event such breach cannot be remedied within 30 days, make a good faith effort to cure such breach within such 30 day period; or

ii. If the other party shall make an assignment for the benefit of creditors, admits its insolvency, is adjudicated bankrupt or insolvent by any court of competent jurisdiction, any trustee or receiver is appointed for it or for any of its property, or such party files any involuntary petition under any bankruptcy or similar law providing for its reorganization, dissolution, liquidation or winding-up.

b. Termination of this Agreement shall be without prejudice to any rights of either party against the other which may have accrued up to the date of such termination, including the right to pursue injunctive relief.

c. In particular, termination of this Agreement for any reason shall not bring to an end the rights and obligations of the parties for commitments prior to

termination and under Sections 6, 7 8 and 9, each of which shall survive any termination of this Agreement.

6. *Ownership*. National will remain the owner of all copyrights, patents, designs, inventions, technology and ideas created or associated with the services provided by National pursuant to this Agreement or any Statement of Work (collectively, "Proprietary Rights"). The Company has no right, title or interest in the Proprietary Rights, and the Company agrees to execute any documents and take any other actions that Company may reasonably consider necessary and desirable to protect National's ownership of the Proprietary Rights.

7. *Confidentiality*. Each party may be given access to confidential or proprietary information of the other ("Proprietary Information"). The parties each agree to maintain in confidence the Proprietary Information of the other with the same standard of care which the receiving party uses to safeguard its own proprietary information, but in no event less than reasonable care, if the Proprietary Information is furnished on a confidential basis and marked or identified as confidential or proprietary when first disclosed. The obligations in this Section will not apply to any Proprietary Information which (i) is or becomes available to the public other than by breach of this Agreement by the receiving party, (ii) is rightfully received by the receiving party from a third party without confidentiality limitations; (iii) is independently developed by the receiving party, or (iv) is known to the receiving party without any restriction as to use or disclosure prior to first receipt of same from the disclosing party.

8. *Non-Solicitation*. During the term of this Agreement, and for a period of one (1) year thereafter, unless otherwise agreed by the parties in writing, each party agrees not to employ, retain, or to solicit the employment or retention as a contractor of any employee or contractor retained by the other party, whether or not such person was involved with the services provided pursuant to this Agreement.

9. *Indemnity*. National agrees to indemnify and hold harmless the Company from any and all loss of damage, including personal injury and property damage, and expenses, including attorney fees and litigation expenses, including expert fees which may arise directly or indirectly from the performance or failure of performance by National of its obligations under this Agreement and those occasioned wholly or in part by any intentional or negligent act or omission of National or that of anyone directly or indirectly employed by National or performing work or supplying services or materials at the request of or under the direction of National. National agrees to promptly pay when due for all labor, equipment, materials and supplies used or consumed in completing this Agreement and to indemnify and hold harmless the Company from any claim, lien, judgment, court costs and expenses, including attorneys fees, and

litigation expenses, including expert fees, incurred on account of National's failure to comply with the terms of this Agreement. The Company agrees to indemnify and hold harmless National of any and all loss or damage that may arise directly from the failure of performance of the Company of its obligations under this agreement.

10. *Option to Purchase*. Upon a proposed change in ownership of the Company, whether by sale of substantially all of its assets, merger or transfer of voting control whereby at least 50% of the outstanding voting securities of the Company shall be transferred in a single transaction or a series of transactions, or the proposed transfer or assignment of the Company's rights and obligations with respect to the Contract between the Company and the Owner, National shall have the option, prior to consummation of any such proposed transaction, to purchase a 49% equity interest in The Contract for a purchase price of $1.00. The Company agrees to notify National in writing of any such proposed disposition of the Company or its assets or transfer or assignment of the Contract whereupon National shall have ninety (90) days in which to notify the Company of its intention to exercise such option

11. *Right to Participate in Additional Contracts*. The Company hereby further agrees to first offer to National the opportunity to perform services, on any agreement signed by the Company with the Owner, for the term of the Washington Mutual contract provided this agreement is still in effect.

12. *Assignment*. National agrees not to assign this Services Agreement without the prior written consent of the Company which consent shall not be unreasonably withheld.

13. *Insurance*. National shall maintain Worker's Compensation, contractual liability, public liability, and such other insurance in such amounts as may be required of the Company in the Contract Documents between the Owner and the Company during the term of this Agreement. The Company will notify National of such insurance requirements, but in no event will National maintain less than: Commercial General Liability of $1,000,000 each occurrence and $1,000,000 general aggregate (including coverage for Products & Completed Operations and Personal Injury & Advertising Injury), and Employers' Liability of $1,000,000 Combined Single Limit. Within 10 days after the signing of this Agreement, and prior to commencing with the work hereunder, National shall obtain the required insurance from a responsible insurer, and shall furnish certificates of such insurance to the Company, which shall provide for thirty days notice to the Company before cancellation. Similarly, the Company, if requested by National, shall furnish satisfactory evidence of insurance required by the Contract Documents. The Company and National waive all rights against each other and against the Owner, the Manager and all other subcontractors, to the extent permissible

under their respective and appropriate policies of insurance, including damages caused by fire or other perils to the extent covered by property insurance, except such rights as they may have to the proceeds of such insurance.

14. *Relationship*. National will perform its services pursuant to this Agreement as an independent contractor, and in no event will National or any of its agents or employees be construed to be an agent or employee of Company. In no event shall this Agreement be interpreted as creating a joint venture, franchise, or partnership. If any provision or combination of provisions in this Agreement is found by a court or government agency to create a franchise relationship, the parties agree that the provision or provisions shall be severed, retroactive to the date of creation of this Agreement.

15. *Injunctive Relief*. The parties agree that it would be difficult to measure damage to from any breach of this Agreement and that monetary damages may be an inadequate remedy. Accordingly, the parties agree that if either party breaches or take any steps preliminary to breaching this Agreement, the other party may be entitled, in addition to all other remedies it may have at law or in equity, to an injunction or other appropriate orders to restrain any such breach, without showing or proving any actual damages.

16. *Notices*. Any notice required or permitted to be given under this Agreement will be sufficient if in writing and personally delivered or sent by first-class or overnight mail to the address set forth on the last page of this Agreement. Either party may, by notice in writing to the other party, change the address to which notices to that party are to be given.

17. *Damages*. National will not be liable for any loss, damage, detention, delay or failure to perform in whole or in part, resulting from causes beyond its control. Under no circumstances shall either party be liable for any consequential, incidental, indirect, or special damages whatsoever, including but not limited to lost profits, with respect to claims made under this Agreement.

18. *Waiver*. The waiver by one party of the breach of any provision of this Agreement by the other party will not operate or be construed as a waiver of any subsequent breach by that party.

19. *Modification*. No amendment, modification or discharge of this Agreement will be valid unless it is in writing and duly executed by the party to be charged therewith.

20. *Construction*. This Agreement will be construed in accordance with and governed by the laws of the State of Delaware (without regard to its conflict of laws provisions).

21. *Severability*. The invalidity or unenforceability of any provision in this Agreement will in no way affect the validity or enforceability of any other provision.

22. *Assignment*. The rights and obligations of this Agreement may not be assigned by either party without the prior written consent of the other party. This Agreement will inure to and be binding on the parties, and their successors and assigns.

23. *Entire Agreement*. This Agreement is the entire agreement between the parties and supersedes any and all prior agreements and understandings between the parties.

24. *Attorney Fees/Venue*. Any suit or action to interpret or enforce this Agreement or with respect to this Agreement must be filed in Delaware, ~~Md.,~~ if jurisdiction exists, and the prevailing party will be reimbursed by the non-prevailing party for all attorney fees, costs and expenses incurred in connection with the suit or action, at trial or on appeal.

25. *Counterparts*. This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

Executed and effective as of the date first above written.

NATIONAL:

NATIONAL GLASS & GATE SERVICE, INC.

By: [signature]
Name: Charlie Vachon
Title: President

COMPANY:

SERVICE EVERYWHERE, LLC

By: [signature]
Name: Sherra Aguirre
Title: President

# EXHIBIT A

## Statement of Work

The statement of work under this agreement is any and all Services to be provided to Washington Mutual under a Master Independent Contractors Agreement for Facility Management.

## Service Everywhere – National Glass & Gate Division of Duties

### Service Everywhere

Service Requests

- Monitor the Service Works system constantly for service requests in the territory designated as the Houston office's responsibility
- Complete the necessary steps for processing service requests for the Houston team's areas of responsibilities during normal business hours Monday through Friday
- Place follow up calls to ensure the work has been completed by the contractor
- Prepare a closed work order schedule for e-mail to Corp. Facilities daily
- Obtain quotes for larger ticket requests and obtain approval from the facility manager before the contractor commences the work

Project Oversight

- Monitor quality assurance overall
- Monitor the contractors and make recommendations when appropriate
- Monitor contractor assignments
- Analyze performance in meeting required response times
- Analyze the system data entry for integrity
- Review project for areas of improved efficiencies
- Oversee the insurance compliance issues
- Provide statistical reports routinely

Project Accounting

- Receive electronic report daily from NG&G office detailing the invoices sent out to the customer
- Compare system data to electronic data received from NG&G Services
- Review invoices entered into the Service Works system at the NG&G Services office in Providence, RI
- Maintain the project bank account at Washington Mutual Bank
- Track cash receipts with customer
- Receive payment from customer
- Disburse funds to NG&G Services in the amount of 95% of billed amount upon receipt of payment for invoices for work requested prior to October 20, 2002 within 72 hours of receipt of check from customer
- Disburse funds to NG&G for the cost billed by the contractor upon receipt of payment of invoices for work requested October 20, 2002 and after within 72 hours of receipt of check from customer
- Disburse the 51/49 split of the billed amount in excess of the contractor billed amount for work requested October 20, 2002 and after at the same time as disbursement of funds to cover contractor cost billed amount
- Provide a detailed accounting to NG&G within 72 hours of receipt of check

**NG&G Services**

Service Requests

- Provide Service Works application
- Receive service requests from customer
- Enter service requests into Service Works
- Complete the necessary steps for fulfilling service requests, for the Providence team's areas of responsibility with a specified number of employees during normal business hours Monday through Friday
- Place follow up calls to ensure the work has been completed by the contractor
- Prepare a closed work order schedule for e-mail to Corp. Facilities daily
- Obtain quotes for larger ticket requests and obtain approval from the facility manager before the contractor commences the work
- Provide service request receipt and processing coverage after normal business hours, on weekends and holidays with skeleton crew

Contractor Management

- Qualify and manage contractors
- Provide contractor database
- Assign contractors to project sites
- Obtain certificates of insurance for all contractors

Project Accounting

- Receive invoices from contractors
- Enter invoices received from contractors into Service Works
- Forward an electronic report daily detailing the billings sent to the customer
- Provide accounts receivable aging report monthly

**EXHIBIT B**

**Compensation**

1.*Method of Payment*. National shall receive a fixed monthly fee of $1,000.00 for the Software Services associated with the Company's service software Service Works described in the Statement of Work. The Company agrees to establish a separate bank account designated exclusively for all work to be performed pursuant to the Contract. Such account shall be maintained at a reputable financial institution.

2. *Expenses*. Company agrees to reimburse National or The Company for reasonable and necessary out-of-pocket expenses, including travel, meal, and lodging expenses incurred in connection with the Agreement provided they are agreed to in writing by The Company and National Glass & Gate Service, Inc. prior to being incurred. Reimbursement of expenses by Company shall be made within thirty (30) days after submission to Company of expense reports (with copies of supporting documentation), provided said expenses have been agreed to in writing by the Company and National prior to being incurred.

3. *Company Delays*. In the event that Company fails to fulfill any of its responsibilities under this Agreement in a proper and timely manner and such failure causes a delay in the provision of the subcontracting services or results in additional costs to National, National shall take such action as is reasonable and prudent to mitigate the effect of such delay and shall provide Company with a written specification of such delay and the resultant costs. Within five (5) business days, Company shall either (i) agree in writing to pay these costs to National at National's then current rates for the subcontracting services involved, or (ii) relieve, in writing, National of its remaining obligations under the applicable Statement of Work which were affected by Company's failure. In addition, in the event Company elects the option in clause (i) above, any time limits for National's performance shall be extended by a period of time equal to the duration of Company's delay; provided that if, in National's reasonable judgment, Company's delay caused a more significant delay in National's delivery of subcontracting services, National shall notify Company in writing and the time limits for National's performance will be extended for such longer period as National designates in the notice.

4. *Net Profit on Project*. The Company and National hereby agrees that the net profits earned with respect to the Project, after deducting the monthly fees due to National and the Company and payments due to other vendors and payment of applicable taxes, shall be divided as follows:

-National [49%]
-Company [51%]

***[The payments shall be made upon receipt of payments from the customer.]***

***The payments are conditional upon having paid all vendor payments for work performed and for cash receipts from the customer through the calculation date of the net profit.***

5. *Taxes*. All amounts specified in this Agreement are exclusive of all federal, state, local and foreign taxes, duties, tariffs, levies and similar assessments. Company shall pay all such taxes, however designated, that are payable in respect of this Agreement or any Appendix, excluding taxes based upon National's property or income. If Company does not pay such taxes, National may pay such taxes and Company will promptly reimburse National for those payments. National and the Company each acknowledges that it is responsible for paying withholding and similar taxes for its own employees.

# EXHIBIT 2

# SERVICES AGREEMENT

This Services Agreement (the "Agreement") is effective as of July 1, 2004, between Service Everywhere, L.L.C., a Delaware company (sometimes called "Company" or "Contractor"), and National Glass & Gate Service, Inc., a Rhode Island Corporation doing business as NG&G Facility Services International, Inc. and having an office a 263 Jenckes Hill Road, Lincoln, Rhode Island 02865, ("NG&G")

The Company is the Contractor under the Master Contractor - Vendor Agreement (the "Contract") between Trammell Crow Services, Inc. (hereinafter called "Owner") and the Company, dated August 1, 2004, for Bank of America's locations stipulated in the contract (the "Project"). NG&G has agreed to furnish, in conjunction with Service Everywhere, necessary labor, equipment, services, supplies, and other incidental services necessary to perform Call Center Support and Vendor Management Support for services under the Contract. This Agreement sets forth the terms and conditions pursuant to which the Company will engage NG&G's service.

<u>Agreement</u>

The parties agree as follows:

1. *National Services*. The Company engages NG&G to provide the services described on any mutually signed Statement of Work attached to this Agreement as <u>Exhibit A</u> ("Statement of Work"). For any work that is included in the Statement of Work, NG&G agrees to be bound by the applicable provisions of the Contract and General Conditions between the Owner, and the Company, including any specifications therein (collectively called the "Contract Documents"), and amendments thereto, and any requirements of the Manager. The Company has provided to NG&G a complete copy of all of the Contract Documents and agrees to furnish in writing to NG&G any additional requirements of the Manager as now known or shall hereinafter be specified. NG&G agrees to assume toward the Company all of the obligations and responsibilities that the Company by the Contract Documents assumes toward the Owner, insofar as they are applicable to the work to be performed under this Services Agreement.

2. *Warranty*. NG&G shall warrant its work in accordance with the terms of the Contract Documents, or if no warranty is called for during the term of the Project, NG&G shall perform all work in accordance with the Contract Documents, the instructions of the Company and Manger, and in a workmanlike manner. The work to be performed under this Agreement shall be commenced immediately upon notice from the Company. NG&G will provide the required manpower, materials, associated submittals and equipment to comply with the Contract Documents and to assure that the Call Center and Vendor Management Support Center is being properly run

throughout the term of the Contract. NG&G shall complete the work undertaken pursuant to the Statement of Work in a prompt and workmanlike manner and shall not, by delay or otherwise, interfere with or hinder the work of the Company or subcontractors retained by the Company. NG&G shall be responsible for proper coordination of its services with that of the Company and such subcontractors and shall be available, or have representatives available, upon reasonable prior notice, at project meetings and at other times as necessary to assist with this coordination.

3. *Compensation*. Company will compensate NG&G pursuant to the terms of Exhibit B.

4. *Term*. The term of this Agreement shall begin on the above date, and, subject to earlier termination as provided below, terminate concurrently with the Contract.

5. *Termination*.

   a. A party shall have the right to terminate this Agreement at any time by notice in writing to the other party upon any of the following events:

      i. If the other party commits a material breach of any of the terms of this Agreement and does not, within thirty (30) days of receipt of notice of the breach (if the same be capable of remedy), remedy such breach or in the event such breach cannot be remedied within 30 days, make a good faith effort to cure such breach within such 30 day period; provided however, that nothing herein stated to the contrary shall prevent either party, after a 24 hour electronically transmitted notice of said such material breach or emergency, to secure alternate services, to remedy said breach in the interest of continuing service delivery to customer; or

      ii. If the other party shall make an assignment for the benefit of creditors, admits its insolvency, is adjudicated bankrupt or insolvent by any court of competent jurisdiction, any trustee or receiver is appointed for it or for any of its property, or such party files any involuntary petition under any bankruptcy or similar law providing for its reorganization, dissolution, liquidation or winding-up.

   b. Termination of this Agreement shall be without prejudice to any rights of either party against the other which may have accrued up to the date of such termination, including the right to pursue injunctive relief.

   c. In particular, termination of this Agreement for any reason shall not bring to an end the rights and obligations of the parties for commitments prior to

termination and under Sections 6, 7 8 and 9, each of which shall survive any termination of this Agreement.

6. *Ownership*. NG&G will remain the owner of all copyrights, patents, designs, inventions, technology and ideas created or associated with the services provided by NG&G pursuant to this Agreement or any Statement of Work (collectively, "Proprietary Rights"). The Company has no right, title or interest in the Proprietary Rights, and the Company agrees to execute any documents and take any other actions that Company may reasonably consider necessary and desirable to protect NG&G's ownership of the Proprietary Rights.

7. *Confidentiality*. Each party may be given access to confidential or proprietary information of the other ("Proprietary Information"). The parties each agree to maintain in confidence the Proprietary Information of the other with the same standard of care which the receiving party uses to safeguard its own proprietary information, but in no event less than reasonable care, if the Proprietary Information is furnished on a confidential basis and marked or identified as confidential or proprietary when first disclosed. The obligations in this Section will not apply to any Proprietary Information which (i) is or becomes available to the public other than by breach of this Agreement by the receiving party, (ii) is rightfully received by the receiving party from a third party without confidentiality limitations, (iii) is independently developed by the receiving party, or (iv) is known to the receiving party without any restriction as to use or disclosure prior to first receipt of same from the disclosing party.

8. *Non-Solicitation*. During the term of this Agreement, and for a period of one (1) year thereafter, unless otherwise agreed by the parties in writing, each party agrees not to employ, retain, or solicit the employment or retention as a contractor of any employee or contractor retained by the other party, whether or not such person was involved with the services provided pursuant to this Agreement.

9. *Indemnity*. NG&G agrees to indemnify and hold harmless the Company from any and all loss of damage, including personal injury and property damage, and expenses, including attorney fees and litigation expenses, including expert fees which may arise directly or indirectly from the performance or failure of performance by NG&G of its obligations under this Agreement and those occasioned wholly or in part by any intentional or negligent act or omission of NG&G or that of anyone directly or indirectly employed by NG&G or performing work or supplying services or materials at the request of or under the direction of NG&G . NG&G agrees to promptly pay when due for all labor, equipment, materials and supplies used or consumed in completing this Agreement and to indemnify and hold harmless the Company from any claim, lien, judgment, court costs and expenses, including attorneys fees, and

litigation expenses, including expert fees, incurred on account of NG&G's failure to comply with the terms of this Agreement. The Company agrees to indemnify and hold harmless NG&G of any and all loss or damage that may arise directly from the failure of performance of the Company of its obligations under this agreement.

10. *Option to Purchase*. Upon a proposed change in ownership of either the Company or NG&G, whether by sale of substantially all assets, merger or transfer of voting control whereby at least 50% of the outstanding voting securities of either party shall be transferred in a single transaction or a series of transactions, or the proposed transfer or assignment of the rights and obligations of either party with respect to this Contract, the other party shall have the first right of refusal to retain the business which is the subject of this contract on terms consistent herewith for the remainder of the term of this contract.

11. *Right to Participate in Additional Contracts*. The Company hereby further agrees to first offer to NG&G the opportunity to perform services, other than janitorial services, for the term of the– Bank of America contract provided this agreement is still in effect.

12. *Assignment*. NG&G agrees not to assign this Services Agreement without the prior written consent of the Company which consent shall not be unreasonably withheld.

13. *Insurance.* NG&G shall maintain Worker's Compensation, contractual liability, public liability, and such other insurance in such amounts as may be required of the Company in the Contract Documents between the Owner and the Company during the term of this Agreement. The Company will notify NG&G of such insurance requirements, but in no event will NG&G maintain less than: Commercial General Liability of $1,000,000 each occurrence and $1,000,000 general aggregate (including coverage for Products & Completed Operations and Personal Injury & Advertising Injury), and Employers' Liability of $1,000,000 Combined Single Limit. Within 10 days after the signing of this Agreement, and prior to commencing with the work hereunder, NG&G shall obtain the required insurance from a responsible insurer, and shall furnish certificates of such insurance to the Company, which shall provide for thirty days notice to the Company before cancellation. Similarly, the Company, if requested by NG&G, shall furnish satisfactory evidence of insurance required by the Contract Documents. The Company and NG&G waive all rights against each other and against the Owner, the Manager and all other subcontractors, to the extent permissible under their respective and appropriate policies of insurance, including damages caused by fire or other perils to the extent covered by property insurance, except such rights as they may have to the proceeds of such insurance.

14. *Relationship*. NG&G will perform its services pursuant to this Agreement as an independent contractor, and in no event will NG&G or any of its agents or employees be construed to be an agent or employee of Company. In no event shall this Agreement be interpreted as creating a joint venture, franchise, or partnership. If any provision or combination of provisions in this Agreement is found by a court or government agency to create a franchise relationship, the parties agree that the provision or provisions shall be severed, retroactive to the date of creation of this Agreement.

15. *Injunctive Relief*. The parties agree that it would be difficult to measure damage to from any breach of this Agreement and that monetary damages may be an inadequate remedy. Accordingly, the parties agree that if either party breaches or take any steps preliminary to breaching this Agreement, the other party may be entitled, in addition to all other remedies it may have at law or in equity, to an injunction or other appropriate orders to restrain any such breach, without showing or proving any actual damages.

16. *Notices*. Any notice required or permitted to be given under this Agreement will be sufficient if in writing and personally delivered or sent by first-class or overnight mail to the address set forth on the last page of this Agreement. Either party may, by notice in writing to the other party, change the address to which notices to that party are to be given.

17. *Damages*. National will not be liable for any loss, damage, detention, delay or failure to perform in whole or in part, resulting from causes beyond its control. Under no circumstances shall either party be liable for any consequential, incidental, indirect, or special damages whatsoever, including but not limited to lost profits, with respect to claims made under this Agreement.

18. *Waiver*. The waiver by one party of the breach of any provision of this Agreement by the other party will not operate or be construed as a waiver of any subsequent breach by that party.

19. *Modification*. No amendment, modification or discharge of this Agreement will be valid unless it is in writing and duly executed by the party to be charged therewith.

20. *Construction*. This Agreement will be construed in accordance with and governed by the laws of the State of Delaware (without regard to its conflict of laws provisions).

21. *Severability*. The invalidity or unenforceability of any provision in this Agreement will in no way affect the validity or enforceability of any other provision.

22. *Assignment*. The rights and obligations of this Agreement may not be assigned by either party without the prior written consent of the other party. This Agreement will inure to and be binding on the parties, and their successors and assigns.

23. *Entire Agreement*. This Agreement is the entire agreement between the parties and supersedes any and all prior agreements and understandings between the parties.

24. *Attorney Fees/Venue*. Any suit or action to interpret or enforce this Agreement or with respect to this Agreement must be filed in Delaware, Md., if jurisdiction exists, and the prevailing party will be reimbursed by the non-prevailing party for all attorney fees, costs and expenses incurred in connection with the suit or action, at trial or on appeal.

25. *Counterparts*. This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

Executed and effective as of the date first above written.

| | |
|---|---|
| NG&G : | COMPANY: |
| NATIONAL GLASS & GATE SERVICE, INC. | SERVICE EVERYWHERE, LLC |
| By: [signature] | By: [signature] |
| Name: Charles J. Vachon | Name: Sherra Aguirre |
| Title: President | Title: President |

**EXHIBIT A:**

**Statement of Work**

The statement of work under this agreement is any and all Services to be provided to Bank of America under a Master Contractor - Vendor Agreement.

**Service Everywhere - NG&G**

**Service Everywhere**

Service Requests
- o Receive requests at the Customer Solutions Center in the Houston office through dedicated toll free phone number, e-mail and fax
- o Enter the service requests in the Service Works system
- o Processing including dispatching of contractors
- o Place follow up calls to ensure the work has been completed by the contractor
- o Obtain quotes for larger ticket requests and obtain approval from the Customer Solutions Center before the contractor commences the work
- o Reconcile weekly open work orders report received from Customer Solutions Center

Project Oversight
- o Monitor quality assurance overall
- o Monitor the contractors and make recommendations when appropriate
- o Monitor contractor assignments
- o Analyze performance in meeting required response times
- o Analyze the system data entry for integrity
- o Review project for areas of improved efficiencies
- o Oversee the insurance compliance issues
- o Provide statistical reports routinely

Contractor Qualifying and Managing
- o Identify the capacity of the present contractor in the state of Florida
- o Work with NG&G Network Coordinator to qualify customer's incumbent service providers
- o Work with NG&G Network Coordinator for contractor assignment
- o Obtain certificates of insurance from each contracted firm
- o Execute subcontractor agreements with subcontractors assigned for project

Project Accounting
- o Maintain the dedicated project bank account
- o Bill customer in accordance with Master Contractor – Vendor Agreement Exhibit A
- o Receive payment from customer and apply in Service Works to applicable work orders
- o Issue payments to appropriate subcontractors
- o Issue payment to NG&G for 49% share of profit along with detailed report

**NG&G Services**

Service Requests
- o Provide Service Works application and upload customer site information
- o Receive requests from the Customer Solutions Center through a dedicated toll free phone number, e-mail and or fax
- o Enter the service requests in the Service Works system
- o Processing, including dispatching of contractors
- o Place follow up calls to ensure the work has been completed by the contractor

  - Obtain quotes for larger ticket requests and obtain approval from the Customer Solutions Center before the contractor commences the work
  - Reconcile weekly open work orders report received from the Customer Solutions Center
  - Provide service requests receipt and processing coverage after normal business hours, on weekends and holidays

Contractor Management

- Monitor quality assurance overall
- Monitor the contractors and make recommendations when appropriate
- Monitor contractor assignments
- Analyze performance in meeting required response times
- Analyze the system data entry for integrity
- Review project for areas of improved efficiencies
- Oversee the insurance compliance issues
- Provide statistical reports routinely

## EXHIBIT B

## Compensation

*1. Method of Payment.* NG&G shall receive a fixed monthly fee of $1,000.00 for the Software Services associated with the Company's service software Service Works described in the Statement of Work. The Company agrees to establish a separate bank account designated exclusively for all work to be performed pursuant to the Contract. Such account shall be maintained at a reputable financial institution.

2. *Expenses.* Company agrees to reimburse NG&G or The Company for reasonable and necessary out-of-pocket expenses, including travel, meal, and lodging expenses incurred in connection with the Agreement provided they are agreed to in writing by The Company and NG&G prior to being incurred. Reimbursement of expenses by Company shall be made within thirty (30) days after submission to Company of expense reports (with copies of supporting documentation), provided said expenses have been agreed to in writing by the Company and NG&G prior to being incurred.

3. *Company Delays.* In the event that Company fails to fulfill any of its responsibilities under this Agreement in a proper and timely manner and such failure causes a delay in the provision of the subcontracting services or results in additional costs to NG&G. NG&G shall take such action as is reasonable and prudent to mitigate the effect of such delay and shall provide Company with a written specification of such delay and the resultant costs. Within five (5) business days, Company shall either (i) agree in writing to pay these costs to NG&G at NG&G's then current rates for the subcontracting services involved, or (ii) relieve, in writing, NG&G of its remaining obligations under the applicable Statement of Work which were affected by Company's failure. In addition, in the event Company elects the option in clause (i) above, any time limits for NG&G's performance shall be extended by a period of time equal to the duration of Company's delay; provided that if, in NG&G's reasonable judgment, Company's delay caused a more significant delay in NG&G's delivery of subcontracting services, NG&G shall notify Company in writing and the time limits for NG&G's performance will be extended for such longer period as NG&G designates in the notice.

4. *Net Profit on Project.* The Company and NG&G hereby agrees that the net profits earned with respect to the Project, after deducting the monthly fees due to NG&G and the Company and payments due to other vendors and payment of applicable taxes, shall be divided as follows:

-NG&G [49%]
-Company [51%]

***[The payments shall be made upon receipt of payments from the customer.]***

***The payments are conditional upon having paid all vendor payments for work performed and for cash receipts from the customer through the calculation date of the net profit.***

5. _Taxes_. All amounts specified in this Agreement are exclusive of all federal, state, local and foreign taxes, duties, tariffs, levies and similar assessments. Company shall pay all such taxes, however designated, that are payable in respect of this Agreement or any Appendix, excluding taxes based upon NG&G's property or income. If Company does not pay such taxes, NG&G may pay such taxes and Company will promptly reimburse NG&G for those payments. NG&G and the Company each acknowledges that it is responsible for paying withholding and similar taxes for its own employees.

## EXHIBIT C:

Team 1: WA OR NV ID

Team 2: CA AZ NM

Team 3: NE MN IA IL IN OH

Team 4: KS MO OK AR TX

Team 5: NY NJ

Team 6: KY TN GA SC NC FL

Team 7: ME NH MA CT RI

Team 8: PA VA MD DC