UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NATIONAL GLASS & GATE SERVICE, INC. d/b/a NG & G FACILITY SERVICES INTERNATIONAL, INC., | : | |
| Plaintiff | : | |
| vs. | : | C.A. No.: 08-186/S |
| SERVICE EVERYWHERE, LLC, | : | |
| Defendant | : | |

**MEMORANDUM IN SUPPORT OF DEFENDANT, SERVICE EVERYWHERE, LLC'S OBJECTION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

NOW COMES Defendant, Service Everywhere, LLC ("Service"), by and through counsel, and hereby submits the within memorandum in support of its accompanying objection to Plaintiff, National Glass & Gate Service, Inc., d/b/a NG&G Facility Services International, Inc.'s ("NG&G") motion for temporary restraining order in connection with the above-identified action.

## Pertinent Facts

Service is a Delaware limited liability company, having a principal place of business located in Houston, Texas. Service provides call center support, lock and key services, and maintenance and repair services to various national clients, who own office buildings, stores and other commercial facilities. Like Service, NG&G also provides the very same types of services to a similar clientele.

In or about 2001, Service, then a "start-up" company, joint ventured with NG&G to provide services to a number of Service's clients, included in which were certain of the largest of Service's clients, *to wit*, Washington Mutual Bank, F.A. ("WaMu") and Bank of America ("BOA"), respectively. On or about January 1, 2002, Service and NG&G entered into a certain Services Agreement wherein NG&G agreed, in conjunction with Service, to furnish necessary labor, equipment, services, supplies and other incidental services necessary to perform Call Center Support and Vendor Management Support for lock and key services for the benefit of WaMu (the "WaMu Services Agreement").

> Thereafter, on or about July 1, 2004, Service and NG&G entered into another contract wherein NG&G agreed to furnish, in conjunction with Service, the necessary labor, equipment, services, supplies, and other incidental services necessary to perform call center support and vendor management support for services under Service's BOA contract (the "BOA Services Agreement").

In addition to the WaMu and BOA contracts, over the years Service and NG&G have entered into similar arrangements with respect to certain of Service's other clients.

In the spring of 2007, the relationship between Service and NG&G began to deteriorate. At or about that same time WaMu began questioning Service in connection with the "high cost" of certain billings it had received from NG&G relative to services rendered under the WaMu Services Agreement. Generally, vendors that work on projects invoiced Service; however, in practice all invoices were actually addressed to Service in care of NG&G for payment. NG&G would add an agreed-upon "mark-up" to vendor invoices, and send out a bill to Service's clients under Service's logo. With respect to WaMu's 2007 inquiry, when Service received the same, it pulled a random sampling of invoices from

NG&G, and found that a large number of the NG&G invoices reflected the maximum allowable fee. In light of WaMu's inquiries and concerns, this indicated to Service that there was enough probable cause for an audit of NG&G's billing practices.

As a result of its efforts in this regard, Service eventually learned that:

(1) NG&G had overcharged Service for sales taxes, and that there were other possible overpayments by Service;

(2) There were instances where NG&G collected monies due Service, but neither reported or remitted the same to Service;

(3) There were instances of vendors complaining of non-payment;

(4) There were discrepancies with respect to billing and/or accounting practices;

(5) There were instances where NG&G billed clients directly (i.e., invoices addressed on NG&G letterhead rather than under Service's logo which effectively re-directed funds to NG&G;

(6) There were "sale no cost" and "cost no sale" information that materially impacted monies reconciliation and/or funds owed to NG&G that NG&G promised Service, but never provided; and

(7) There were reports that a "transaction fee" charged to vendors by NG&G may have been charged on Service work orders.

In other words, there were potential problems and/or issues regarding NG&G's conduct that were serious enough to warrant further investigation by Service. Service

believes that it was these attempts to "get to the bottom" of NG&G's questionable practices that led to the events that eventually transpired in the second half of 2007.

Prompted by what it had discovered, Service requested, in or about June, 2007, that NG&G submit to an audit, as well as other certain accountability procedures. Further, Service and NG&G actually met in June to review and discuss Service's requirements in accordance with the so-called audit requirements in its contracts with its clients. As a practical matter, NG&G was very resistant to being held accountable to Service. In fact, in an attempt to thwart any further actions by Service, NG&G proposed to Service's partners that Service dismantle its office and allow NG&G to "run" all Service operations out of their Providence, Rhode Island office so that NG&G could control all billing and accounting protocols.

Shortly thereafter, NG&G began to escalate demands for payment with Service over allegedly past due invoices; however, because certain of those billings had not yet been collected by Service the same were not yet due and owing to NG&G until such time as the same were collected. This was done despite the fact that NG&G participated in weekly collection calls with Service in which all payments and collection efforts were reported and discussed by and between Service and NG&G.

In late Summer of 2007, NG&G continued to accuse Service of non-payment of certain monies even though the same were not contractually due and owing NG&G, and, further, attempted to use that demand to threaten Service, disparage Service's reputation with its customers, and, eventually, as an excuse to terminate the WaMu and BOA Service Agreements, respectively, in February, 2008. Service repeatedly tried to defuse the "non-

payment" dispute, as well as obtain NG&G's audit compliance. NG&G responded mostly by threatening to file liens against Service's clients, although it had no contractual right to do so, knowing that the same would significantly compromise Service's relationship and ongoing business with those clients.

At or about the end of 2007, while Service was endeavoring in good faith to resolve its disputes with NG&G, upon information and belief, NG&G induced one of Service's clients to terminate Service's services, and to retain NG&G directly without giving Service any notice or explanation with respect to the same. Not long thereafter, NG&G also removed Service's outstanding billings to the client from the software shared by and between NG&G and Service. NG&G also collected the monies due Service from that client, but did not notify Service, or pay or account due Service for the funds prior to the termination of the contract.

NG&G also directly billed some of Service's clients, without notice to Service, in an apparent attempt to divert funds due Service. In addition, in the course of performing services for one of Service's larger customers, BOA, NG&G also began to replace certain vendors with an NG&G affiliate that charged higher prices without any business justification for doing so. The effect of such actions were simply to squeeze Service's profit margins, and to try to gain a competitive advantage. Finally, in or about February, 2008, NG&G abruptly locked Service out of the software leased from NG&G without prior notice. The software was needed by Service to provide services to service his clients, and as such, Service was forced to scramble to transition clients and operate under new software, at great expense, to protect itself in the continuance of business operations.

Subsequently, in late February, 2008, NG&G terminated the WaMu and BOA Services Agreements, respectively. After termination of those contracts, Service tried to resolve the still outstanding business issues with NG&G; however, the same was not resolved despite certain accommodations entered into by and between NG&G and Service in the early Spring of 2008.

Thereafter, on April 25, 2008, in a preemptive action, notwithstanding that the same was contrary to the forum selection clauses in the WaMu and BOA Services Agreements, respectively, NG&G filed the instant litigation in the Rhode Island Superior Court, Providence County. On May 15, 2008, Service filed its Notice of Removal, pursuant to 28 U.S.C. §§ 1441 and 1446, respectively, thereby removing the instant matter from the Providence County Superior Court to this Court.

In addition, on May 15, 2008, NG&G moved this Court for the entry of a temporary restraining order adverse to Service. The Court conducted a conference on the same on May 16th, at the conclusion of which the parties were directed to report to the Court for a further conference on the subject motion for injunctive relief on May 19, 2008.

## Argument

As an initial matter, Service reasserts and incorporates herein by reference the arguments and legal position advanced in support of its previously filed motion to dismiss, or, in the alternative, motion to transfer venue. Service submits that this Court should take no action with respect to the instant motion for temporary restraining order for the reasons set forth therein. In its papers, NG&G correctly sets forth the requirements for

injunctive relief under Rhode Island law: (1) the likelihood of success on the merits; (2) irreparable harm; (3) balance of the equities; and (4) the need to preserve the status quo.

*See, generally*, *Leone v. Town of New Shoreham*, 534 A.2d 871, 873 (R.I. 1987).

In the first instance, Service respectfully submits that it is impossible for NG&G to establish, at this very early juncture of the case, that it has a likelihood of success on the merits. In fact, to the contrary, all that NG&G has the ability to demonstrate is simply that there was a contractual relationship by and between the parties, and, further, pursuant to the course of conduct and dealing within the context of that relationship, the same deteriorated. During the course of the deterioration of the business dealing by and between the parties, disputed matters arose, including issues involving the billing practices, accounting procedures and certain of the protocols of NG&G relative to Service's clients and/or vendors.

NG&G papers make much of the so-called "escrow arrangement" that was entered into by the parties subsequent to NG&G's termination of the WaMu and BOA Services Agreements, respectively, in late February, 2008. This so-called "escrow arrangement" was merely an accommodation or framework within which the parties were attempting to resolve, and dispose of, their dispute. Unfortunately, this did not come to pass. That aside, the mere existence of the so-called "escrow arrangement" is not dispositive of any potential for a likelihood of success on the merits by NG&G, nor is it, in fact, the satisfaction of the preservation of status quo prong that would entitle NG&G to the relief sought.

Service respectfully submits that the status quo was established by the parties' contracts. When those contracts were terminated, NG&G directed certain of the vendors relative to the WaMu and BOA Services Agreements, respectively, to seek payment directly from Services rather than through NG&G, which had been the procedure established by the contracts. This represented a departure from the well-established course of conduct and dealing, and established the status quo since the termination of the subject Services Agreements. Insofar as NG&G has relieved itself of its obligations to pay vendors, there is no need for the escrow, which NG&G posits is absolutely critical, and thus, the underpinning of its motion for injunctive relief. Notwithstanding, given the post-termination conduct of the parties, a new status quo has been established, one that is at odds with NG&G's motion for temporary restraining order.

Further, in light of the "unclean hands" of NG&G, the balance of the equities does not favor the relief sought. Indeed, there is a genuine dispute as to the so-called NG&G "profit interest". Moreover, the mere existence of the so-called "escrow arrangement" in and of itself does not determine this issue. In fact, on or about April 2, 2008, Service discontinued any further payments into the purported escrow account on the basis that NG&G had no ability to account for what vendors may or may not have been paid, notwithstanding that the same were to have been paid from a certain portion of that account, and, further, NG&G was unable to be accountable to Service with respect to its prior billing and accounting practices in aid of any resolution of the parties' dispute.

Finally, the status quo would not be served or otherwise preserved as a result of any requested injunctive relief absent a full evidentiary hearing on the subject request. Simply

put, the status quo, at least for the last several months, has been that vendors have been paid directly by Service. In fact, by and large, the same has been the case since after January 1, 2008 insofar as Service has paid vendors in excess of approximately $520,000.00 during that time, which said payments were the ultimate responsibility of NG&G; however, NG&G failed and/or refused to honor its obligations under the parties' agreements.

WHEREFORE, for the foregoing reasons, Service respectfully prays that this Court deny NG&G's motion for temporary restraining order, that this Court award to Service any and all attorneys' fees and costs incurred in its objection to the subject motion for temporary restraining order, and, further, that this Court award to Service such other and further relief as this court may deem fair, just and reasonable.

Respectfully submitted,

Service Everywhere, LLC

By its Attorneys,

/s/ Christopher M. Mulhearn
Christopher M. Mulhearn (#5188)
**Ferucci Russo, P.C.**
55 Pine Street, Fourth Floor
Providence, RI 02903
Tel: (401) 455-1000
Fax: (401) 455-7778
Email: cmulhearn@frlawri.com

Dated: May 19, 2008

## Certification of Service

I hereby certify that on this 19th day of May, 2008, a true and accurate copy of the foregoing was served upon **Stacy P. Nakasian, Esq.**, Duffy, Sweeney & Scott, Ltd., One Turks Head Place, Suite 1200, Providence, Rhode Island, 02903, by facsimile and by first-class, postage prepaid mail.

/s/ Christopher M. Mulhearn