UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NATIONAL GLASS & GATE SERVICE, INC. d/b/a NG&G FACILITY SERVICES INTERNATIONAL, INC. Plaintiff | : | |
| v. | : | C.A. NO: 08-186 |
| SERVICE EVERYWHERE, L.L.C. Defendant | : | |

**MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION TO ADJUDGE DEFENDANT SERVICE EVERYWHERE, L.L.C. IN CONTEMPT**

Plaintiff National Glass & Gate Service, Inc. d/b/a NG&G Facility Services International, Inc. ("NG&G"), submits this memorandum in support of its Emergency Motion to Adjudge Service Everywhere, L.L.C. in Contempt for its admitted failure to make payments called for in the Consent Order entered by the Court on July 31, 2008.

**FACTS**

**1. The Service Agreements**

NG&G is engaged in the business of providing facilities maintenance and repair services for its customers. Defendant Service Everywhere, L.L.C. ("Service Everywhere") is a contractor that has service agreements with certain property owners and their management agents ("Owners") to perform call center support and provide related services for maintenance and repair of the Owners' properties. The Owners under agreement with Service Everywhere include Bank of America and Washington Mutual Bank, S.A.

In 2002, NG&G and Service Everywhere entered into a contract pursuant to which NG&G agreed to provide on behalf of Service Everywhere virtually all services required of

Service Everywhere by its contract with Washington Mutual. The services NG&G agreed to provide include receiving the property owner's request for service at NG&G's Rhode Island call center, dispatching its contracted vendors to perform the work, and paying vendors for the services performed. In 2004, NG&G and Service Everywhere entered into a similar contract for NG&G to provide the same services to support Service Everywhere in its contract with Bank of America. NG&G also has performed similar services for Service Everywhere in connection with other Owners pursuant to other service agreements. As used herein, the term "Service Agreements" refers collectively to the contracts and service agreements between Service Everywhere and the Owners.

At all times relevant to this action, the Service Agreements and practice between the parties provided that Service Everywhere and NG&G would split the profits on work provided by NG&G on a 51/49 basis after payment of the vendors NG&G contracted with to perform the work. Service Everywhere would receive 51% of the amount collected from the Owners after deducting applicable vendor costs ("Service Everywhere Profit Interest"), and the remaining 49% of the profit would be disbursed to NG&G by Service Everywhere upon collection of payments from the Owners.

Pursuant to their Service Agreements and practice, after a job was completed by NG&G for an Owner, NG&G would submit an invoice to Service Everywhere for the cost of the work performed by the NG&G vendor together with an agreed upon profit mark-up to be shared by Service Everywhere and NG&G pursuant to the agreed upon profit split. Service Everywhere then would issue an invoice to the Owner in the amount indicated by NG&G's invoice. Once Service Everywhere received payment from the Owner, it was obligated to disburse to NG&G the net payment received from the Owner – that is, the total payment received less the Service

Everywhere Profit Interest (referred to herein as "Net Payment"). NG&G was responsible for paying the vendors who performed the work.

**2. NG&G Terminates the Service Agreements**

Between 2002 and 2006 there were many instances in which Service Everywhere made late disbursements of Net Payments to NG&G or failed to generate records required by the Service Agreements. NG&G was patient and did its best to accommodate Service Everywhere. In 2007 the delays in Service Everywhere's disbursements increased. Service Everywhere told NG&G that the delays were due to cash flow problems that Service Everywhere was experiencing.

NG&G continued to accommodate Service Everywhere by, among other things, agreeing in certain cases to extend Service Everywhere's time to make disbursements of Net Payments. These accommodations created a hardship for NG&G because NG&G, not Service Everywhere, bore the costs associated with the work performed for the Owners. On the other hand, Service Everywhere benefited from retaining, for a longer period, 100% of collections, even though it was only entitled contractually to retain the Service Everywhere Profit Interest.

Despite NG&G's accommodations to Service Everywhere, the delays in Net Payment disbursements continued, and a substantial receivable developed. At the same time, NG&G was out of pocket the substantial amounts it paid to vendors for the work performed. Ultimately, NG&G threatened to terminate the Service Agreements and demanded full payment of the outstanding Net Payments due to NG&G. In response, Service Everywhere, for the first time and in an apparent effort to manufacture a basis for further delays, began requesting documentation and imposing other unjustified conditions before it would disburse Net Payments to NG&G.

For these reasons and others, NG&G terminated its Service Agreements with Service Everywhere effective February 27, 2008. At that point, NG&G had submitted invoices of approximately $1,500,000 to Service Everywhere that were outstanding.

Upon information and belief, Service Everywhere had at that time or shortly thereafter billed the Owners for those invoices and subsequently collected from the Owners most if not all of the amounts invoiced. Service Everywhere has retained not only its Profit Interest on those collections, but also NG&G's profit share and the amounts needed to pay the vendors who performed the work.

NG&G and Service Everywhere continued to discuss the outstanding Net Payments due to NG&G. NG&G became increasingly concerned that Service Everywhere was experiencing financial issues and that payments due and owing to NG&G and its vendors were being diverted by Service Everywhere to other purposes.

In early 2008, NG&G proposed that while the parties worked to resolve their issues, Service Everywhere place the Net Payments in escrow. Under the proposal, Service Everywhere would retain its Profit Interest. NG&G made this proposal to ensure that the Net Payments amounts (1) would not be diverted or misapplied by Service Everywhere and (2) would be beyond the reach of Service Everywhere's creditors. The proposal was both reasonable and fair because Service Everywhere was not entitled to retain amounts beyond the Service Everywhere Profit Interest.

In or about March 2008 NG&G and Service Everywhere reached an agreement (the "2008 Agreement") that Service Everywhere would provide weekly reports of collections on outstanding invoices from Owners and that Service Everywhere would make weekly wires of the Net Payments collected to a client funds account maintained by NG&G's counsel (the

"Designated Account"). Service Everywhere made four wires totaling $635,936.57 into the Designated Account pursuant to the 2008 Agreement, but then ceased further deposits.

### 3. <u>NG&G Files Suit and Obtains a TRO</u>

NG&G filed this action to collect the amounts due it under the Service Agreements and to enforce the 2008 Agreement and asked the Court to issue a Temporary Restraining Order. On May 21, 2008, a Temporary Restraining Order ("TRO") entered [Docket No. 9] requiring Service to bring the escrow account up to date. The TRO in clear and unambiguous terms defined how to calculate the amount of money that Service was ordered to pay. The TRO provided:

> Specifically, on or before Friday, May 23, 2008, Service shall pay into escrow an amount equal to the sums that it has collected from property owners for work performed or arranged by NG&G <u>less</u> (1) Service's profit interest in those amounts; (2) amounts Service already has placed into escrow with either its counsel or counsel for NG&G as shown in Service's April 14, 2008 accounting; (3) amounts shown in Service's April 14, 2008 accounting as deductions related to the Mervin's account;[1] and (4) any amounts that Service has paid to vendors on invoices for work arranged or performed by NG&G. In addition, Service shall provide to NG&G at the time of the escrow payment (1) an accounting of collections as described above for which Service has not previously accounted to NG&G in connection with prior escrow payments, which accounting shall be in a form substantially similar to Service's previous accountings; and (2) an accounting with respect to all amounts Service has deducted from the escrow payment on account of amounts paid by Service to vendors, which accounting shall identify each vendor work order paid and the date and amount of the payment made by Service.[2]

On May 23, 2008, Service wired the amount of $96,760.15 to NG&G's counsel's client escrow account.

The parties then proceeded to exchange accounting information in an attempt to reach a negotiated resolution of the case. First, NG&G defined the universe of work at issue in the suit

---

[1] NG&G reserves its right to challenge the validity and amount of this deduction.
[2] The TRO was extended by Order dated June 9, 2008 [Docket No. 12], to remain in effect until further order or hearing on NG&G's Application for Preliminary Injunction.

by identifying the work it performed for Service for which it had not been paid. Because Service controls the process of billing the ultimate customer and collecting customer payments, NG&G had no way of knowing what of the work at issue had been billed and/or collected by Service. Accordingly, the next step involved Service separating the work at issue into two Master Spreadsheets – one reflecting the work that had been billed and collected (referred to as the "Collections Spreadsheet") and one reflecting outstanding invoices (referred to as the "Receivables Spreadsheet").[3] The spreadsheets each listed the work by customer invoice and invoice date. Once the two spreadsheets were prepared, NG&G added information identifying the vendor and other costs associated with the work and indicating whether or not the vendors had been paid by NG&G. Service also added entries to reflect the vendor payments that it had made.

While this accounting work was being undertaken, the parties, through their counsel, worked on the language of a Consent Order that would describe in detail the payments to be made to unwind the parties' business relationship. The draft Consent Order also contained other terms relevant to the settlement of this lawsuit. Service sought to include many terms that were unacceptable to NG&G and, thus, entry of the Consent Order was delayed.

While the parties were battling over the final language of that Order, NG&G discovered from the Master Spreadsheets and other accountings provided by Service[4] that the deposit made by Service on May 23, 2008 in purported compliance with the TRO fell far short of what the

[3] Although there initially was a question about whether all of the work had been billed to customers, Service represented ultimately that it has. Thus, all the work at issue was included in one of the two Master Spreadsheets.
[4] The TRO required Service to account for all collections on work done with NG&G through the date of the Restraining Order. Service has never provided an accounting through the date of the Restraining Order (May 21), but has provided accounting summaries of collections and related vendor payments as of May 12, 2008. None of the accounting summaries provided by Service show how the amount of Service's April 23 deposit was calculated.

Order required. The following summarizes the calculation of the amount of deposit due under the TRO, using Service's own accounting summary:[5]

$1,498,564.00 - Collections through May 12, 2008
($196,158.24) - Service's Profit Interest in Collections
($680,673.62) - Prior Escrow Deposits on April 18, 2008 Accounting
($42,253.06) - Mervyn's-related Deductions on April 18, 2008 Accounting
($256,982.00) - Vendor Payments by Service on work done with NG&G
$322,497.08 - Net

Thus, according to accountings prepared by Service, the total amount of its deposit pursuant to the TRO should have been $322,497.08. Instead, Service deposited only $96,760.15.

NG&G prepared an Emergency Motion to Adjudge Service in Contempt and notified Service of its intent to file the Motion. Rather than face the exposure of its contempt to the Court, Service hastily withdrew its insistence on the additional, unacceptable terms and agreed to the terms of the draft Consent Order. NG&G relied on the entry of the Consent Order in forbearing from moving for contempt of the TRO, since Service's compliance with the Consent Order would include paying the additional amounts due under the TRO.

**4. Service's Noncompliance with the Consent Order**

The Consent Order, which was drafted cooperatively by both parties' counsel, clearly states the payments and other actions required of both parties. Service has failed to perform at least two of its obligation under the Order.

**A. Failure to Pay Vendors**

Paragraph I.3. of the Consent Order [Docket No. 14] provides:

> On or before August 5, 2008, Service shall pay all unpaid vendor invoices relative to the customer invoices listed on the Collections Spreadsheet and the additional collections Service has made through June 27, 2008.

[5] Service's summary reflecting these figures is attached as Exhibit A.

This term was included to resolve a significant issue raised by NG&G in the action. NG&G was concerned about the fact that Service had received and retained payments from its customers for work performed by NG&G vendors, yet Service had not paid the vendors who performed the work associated with the collections. NG&G argued that Service's failure to pay the vendors was interfering with NG&G's relationships with those vendors – which relationships are the cornerstone of NG&G's business.

Prior to the entry of the Consent Order, NG&G and Service agreed on the vendor work at issue. The specific unpaid vendor invoices were identified in the Collections Spreadsheet. The content of that Spreadsheet was agreed to by the parties prior to the entry of the Consent Order and the Spreadsheet is specifically referenced in the Order. The Master Spreadsheet Summary prepared by Service reflects a total of $252,602 vendor payments due on approximately $1.5 million of invoices collected by Service.[6] According to the Consent Order, Service was to have paid all of those vendor invoices on or before August 5, 2008. It has not done so. NG&G heard from some of its vendors after August 5 that Service was refusing to pay them the amounts due. NG&G, thorough its counsel, contacted Service to inform them of this violation of the Consent Order. In response, Service admitted it has not paid $88,579.95 of the invoices at issue.

**B. Service has Failed to Pay Other Undisputed Amounts Due**

In the Consent Order the parties acknowledged an additional claim by NG&G for $57,479 of assets associated with certain invoices not on either Master Spreadsheet. To resolve that claim, the Consent Order provides that NG&G would forward certain specified documentation to Service regarding the invoices at issue; that Service would have seven (7) days to pay its share of the costs reflected in the documentation; and that if Service believed that the documentation was insufficient, it would pay "the amount for which it agrees sufficient

[6] A copy of Service's Master Spreadsheet Summary is attached as Exhibit B.

documentation has been provided." See Consent Order at I.4. NG&G provided the required documentation on August 8, 2008. By letter dated August 26, 2008, Service's counsel belatedly informed NG&G that Service acknowledged that the documentation provided was sufficient to establish $11,827.32 owed by Service to NG&G. Pursuant to the Consent Order, Service was obligated to pay that undisputed amount to NG&G on or before August 14, 2008.[7] No payment has been made.

## ARGUMENT

A court has the inherent authority to enforce its lawful orders through contempt proceedings. *Shillitani v. United States,* 384 U.S. 364, 370 (1966). In a civil contempt proceeding, sanctions may be imposed in order to compel compliance and/or to compensate a party harmed by noncompliance. *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191 (1949) ("Civil…contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance"). Specific intent to violate the order is not required for a party to be held in civil contempt. *Id.* ("Since the purpose [of civil contempt] is remedial, it matters not with what intent the defendant did the prohibited act"). To prove contempt, the moving party must establish: (1) the contemnor had notice that he was "within the order's ambit"; (2) the order was "clear and unambiguous"; (3) the contemnor had the ability to comply; and (4) the order was violated. *U.S. v. Saccoccia*, 433 F.3d 19, 27 (1st Cir. 2005) (citations omitted).

The elements of contempt are easily proven here. There is no question that Service was aware of the Consent Order, as Service negotiated the terms of that Order. Nor can Service assert that the terms of the Order, which its counsel participated in drafting, are either unclear or

[7] NG&G denies that its documentation was deficient to the extent Service asserts as to the remainder of its claim, but that issue is not presently before the Court.

ambiguous. Service has had the ability to comply with the terms at issue. Indeed, Service asked for and was given the timeframe for compliance that is set forth in the Order.[8] What is abundantly clear, and undeniably true, is that Service has blatantly failed to comply with the terms of the Consent Order, just as it defied the clear terms of the TRO.

Service has tried to excuse its failure to pay the vendors as required by Section I.3. of the Consent Order on the grounds that it lacks certain documentation. However, Service's excuse is both legally and factually insufficient. First, NG&G provided Service, at Service's request, all documentation regarding the vendor work at issue weeks before the Consent Order entered. At no time before entry of the Order did Service ever take the position that the documentation provided was deficient. Second, Service has the information it needs to make the payments. Service claims that it actually has prepared checks for the payments, but is withholding them. Thus, Service is capable of complying with the Order, but has simply chosen not to. Finally, if the information needed was so important to Service, it was incumbent upon Service to condition its commitment to pay the vendors on receipt of the information.[9] Yet, Service never mentioned the need for additional information, and it agreed to the language of a Consent Order requiring it make the vendor payments at issue on or before August 5, 2008. For these reasons, even if Service lacked documentation as it claims, which NG&G disputes, that fact would not excuse Service from its clear legal obligation under the terms of the Consent Order to make the vendor payments on or before August 5, 2008. With regard to Services' failure to pay the undisputed

---

[8] For example, NG&G wanted the vendors paid immediately upon entry of the Order. Service, however, asserted that it was obtaining financing and needed until August 5 to make the required payments.

[9] Significantly, in the initial discussions on the Consent Order, NG&G proposed that it make the vendor payments at issue. Among other things, NG&G explained that it had all the backup documentation and accounting data to make the payments more easily than Service. However, Service insisted that it be the party to make the payments and therefore, NG&G provided Service with all the information it needed to make the payments. Again, at no time prior to entry of the Consent Order did Service ever notify NG&G that it was missing documentation needed to make the vendor payments in question.

portion of NG&G's claim under Section I.4. of the Consent Order, Service offers no explanation. The payment is undeniably due and has not been made.

## CONCLUSION

For the foregoing reasons, NG&G requests the entry of an Order (a) adjudging Service in contempt; (b) directing Service, within 24 hours, to pay (i) all outstanding unpaid vendor invoices included on the Collections Spreadsheet in full, and (ii) the amount of $11,827.32 to NG&G; and (c) requiring Service to pay NG&G its attorney's fees and costs incurred in bringing this motion.

Respectfully submitted,

**NATIONAL GLASS & GATE SERVICE, INC.**

By /s/ Stacey P. Nakasian

Stacey P. Nakasian (#5069)
snakasian@duffysweeney.com
Duffy Sweeney & Scott, Ltd.
One Turks Head Place, Suite 1200
Providence, RI 02903
(401) 455-0700 – Phone
(401) 455-0701 – Fax

Dated: September 2, 2008

**CERTIFICATE OF SERVICE**

To: Christopher M. Mulhearn, Esq.
Ferucci Russo, P.C.
55 Pine Street, Fourth Floor
Providence, RI 02903
cmulhearn@frlawri.com

I hereby certify that the within *Memorandum of Law in Support of Emergency Motion to Adjudge Defendant Service Everywhere, L.L.C. in Contempt* was filed through the ECF system on the 2nd day of September, 2008, and will be sent electronically to the above-named counsel who are registered participants identified on the Notice of Electronic Filing.

/s/ Stacey P. Nakasian
Stacey P. Nakasian